IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SALIX PHARMACEUTICALS, LTD, ;        )
SALIX PHARMACEUTICALS, INC.,;        )
BAUSCH HEALTH IRELAND LTD,;          )
ALFASIGMA S.P.A.,                    )
                                     )
                Plaintiffs,          )
                                     ) C.A. No. 20-430-RGA
v.                                   )
                                     ) Trial Volume V
NORWICH PHARMACEUTICALS, INC.,       )
                                     )
                Defendant.           )

                                J. Caleb Boggs Courthouse
                                844 North King Street
                                Wilmington, Delaware

                                Friday, March 25, 2022
                                9:02 a.m.
                                Bench Trial

BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

            MORRIS NICHOLS ARSHT & TUNNELL LLP
            BY:  KAREN JACOBS, ESQUIRE

                    -and-

            VENABLE LLP
            BY:  SCOTT K. REED, ESQUIRE
            BY:  STEVEN C. KLINE, ESQUIRE
            BY:  SHANNON K. CLARK, ESQUIRE

                                For the Plaintiffs

APPEARANCES CONTINUED:

                    SHAW KELLER LLP
                    BY:  KAREN E. KELLER, ESQUIRE

                            -and-

                    AXINN VELTROP & HARKRIDER LLP
                    BY:  CHAD A. LANDMON, ESQUIRE
                    BY:  AZIZ BURGY, ESQUIRE
                    BY:  REBECCA L. CLEGG, ESQUIRE

                                    For the Defendant

                    ***  PROCEEDINGS  ***

DEPUTY CLERK:  All rise.  Court is now in session.  The Honorable Richard G. Andrews presiding.

THE COURT:  All right.  Everyone be seated.

Ms. Clark, nice to see you back.

MS. CLARK:  Thank you, Your Honor.

THE COURT:  So this is closing argument in Salix versus Norwich, and, Plaintiff, I forget, did I say, in fact, you all are splitting this into three parts; right?

MS. CLARK:  I don't think we actually agreed on how to do it.

THE COURT:  Well, maybe they were splitting.

MS. CLARK:  We can do it however Your Honor wishes to --

THE COURT:  No.  No.  No, I'm sorry.

MR. REED:  You're correct, Your Honor.  I asked you if on our side we could have different people talking

about the different cases.

THE COURT:  That's what I meant.

MR. REED:  And we will do that.

THE COURT:  Okay.  No.  No.  You do your side, do 45 minutes, however you're doing it.

MS. CLARK:  Understood.  Thank you.

So I'll address the HE patents first.  And since Your Honor asked questions about obviousness yesterday, that's the first issue that I'll address.

Plaintiffs' obviousness case took into account the weight a POSA would give each reference and the chronology of what was known when determining whether or not what is actually claimed would have been obvious.  That is, methods of reducing the risk of HE or maintaining remission of HE by administering 1,100 milligrams every day for 12 months or longer.

Now, what Norwich argued was a completely different case, whether methods of treating HE would have been obvious.  And even then, Norwich looked at the claims and went in search of the claimed dosage while ignoring the differences or even inconsistencies in the very prior art it cited.

Now, the next list of statements I'm going to make are either undisputed or unrebutted facts.  The HE patents do not cover all types of HE.  They do not cover

persistent HE.  They are directed to the time period in between HE episodes.  And so, the HE patents do not cover treating overt HE episodes, they cover preventing overt HE episode recurrence.

The patents don't just cover any therapeutically effective amount of rifaximin.  They require 1,100 milligrams every day, including claims in which that's administered as 550 milligrams twice a day.  And they don't just cover any length of administration, and certainly not short-term administration.  They require 12 months or more of administration of rifaximin.

And if I could have the HE slide.

On the left-hand side are the two prior art combinations that Norwich asserted render the HE patent claims obvious.  Now, the prior art must be considered as a whole.  But Norwich didn't do that.  At the top of the pyramid, Mas 2003 concluded that the real efficacy of poor or non-absorbable antibiotics in the treatment of HE remains doubtful, and that was after running a Phase III randomized, controlled clinical trial comparing rifaximin to lactitol. Norwich's expert, Dr. Berg, did not consider Mas to be within what he described as the common knowledge.

Bass 2004 concluded that rifaximin was no better than placebo at improving mental grade, and that was in the only Phase III randomized, placebo-controlled trial

available as of the invention date.  Dr. Berg did not consider Bass 2004 when he looked at the differences between the claims and the prior art.  He did not consider it to be among the common knowledge of a POSA.  The only time Dr. Berg considered Bass 2004 was on secondary considerations.  And even then, he looked only at a secondary endpoint.  He completely ignored the primary endpoint of the Bass trial which failed.

Now, Mas 2003 and Bass 2004 were the only Phase III clinical trials available in the prior art, but they were directed to treating HE, and had Bass 2004 been successful, that would have been the clinical trial that got Salix approval of rifaximin to treat HE.  But it failed. And so, the Bausch HE protocol, which is in the first combination, looked at a completely different endpoint: preventing HE recurrence.

Now, the Bausch HE protocol doesn't even make the pyramid because there was no data in it.  And a person of ordinary skill in the art at the time of the invention would not expect a Phase III clinical trial to a completely different endpoint to reasonably be successful when the previous two Phase III clinical trials failed.

And on the bottom of the pyramid is the least reliable form of evidence, and that's expert opinion.  When Dr. Leevy spoke at the Bank of America conference, which is

in the Salix presentation from 2005, he said -- he told the audience that he had 450 patients on rifaximin continuously for 12 and a half months.  But he did not say what kind of HE his patients had, how many of his patients of those 450 had actually taken rifaximin for 12 and a half months.  He didn't say whether any of his patients died.  He didn't say whether or not his patients had succeeded and did not have HE episodes or had their episodes treated.

And when Dr. Leevy did finally report on his cohort of patients that he had administered rifaximin to, he only reported 145 patients in Leevy 2007.  But even then, from that retrospective chart review, he excluded patients who died, and he excluded patients who failed Lactulose or rifaximin and didn't make it all the way through.

And even Dr. Leevy himself concluded in his own paper that his results were "consistent with the possibility" that rifaximin was more beneficial than Lactulose, which, by the way had not been proven effective in any well-designed, controlled clinical trial, either.

Now, Norwich offered no rebuttal evidence to the skepticism that was expressed by the FDA that rifaximin administration for 12 months or more would lead to antibiotic resistance.  And you heard from Dr. DuPont that the longer you give an antibiotic, the more likely you are to have resistance.  There was just no data to move the POSA

from that starting line position that you would expect resistance.  And this is a high-risk patient population, where an infection could easily kill the patient.

And finally, as far as dose of rifaximin to treat HE, which is not claimed, but to treat HE, the only dose-ranging study was in Williams 2000.  And it found that increasing the dose from 600 to 1,200 to 2,400 had no statistically significant impact on mental state.  And so, there was no known dose range for a POSA to even consider when trying to figure out how to treat HE, much less the claimed invention, which is to administer 1,100 milligrams every day for 12 months or longer to prevent HE.

I will then turn to the IBS-D patents, if Your Honor does not have any questions on HE.

THE COURT:  Yeah, if I have questions, for the most part, I will save them until after I've heard from both sides.  At least that's my intention.

MS. CLARK:  Thank you, Your Honor.

So, again, Plaintiffs' obviousness case on the IBS-D patents took into account the weight a POSA would give each reference and the chronology of what happened in order to determine whether what is actually claimed would have been obvious.  Norwich did exactly what the Federal Circuit says you cannot do, and that's to use hindsight to reconstruct and pick and choose from the prior art among

isolated disclosures and to pick and choose from the references only so much as will support its position.

And the most glaring example of that was the way that Norwich had to stitch together the prior art references to arrive at the claimed dosage regimen, 550 milligrams, three times a day for 14 days.

And it had to do that while ignoring the other prior art or ignoring the other dosage regimens in the very prior art it cited.

Now, again, the next statements I'm going to provide are either undisputed or unrebutted.  The patents do not cover treating small intestinal bacterial overgrowth or SIBO.  They cover treating IBS-D.  The patents do not cover just any therapeutically effective amount of rifaximin. They require 550 three times a day for 14 days.

And on the next slide are the three prior art combinations that Norwich asserted, and the common piece of prior art in all three combinations was the RFIB Phase II protocol.  That protocol did not have any results, and of the four dosage regimens it tested, none of those were the claimed dosage regimen, and none of those tested the same daily dose of rifaximin that was, ultimately, claimed.

Cuoco was a retrospective chart review in patients who tested positive for SIBO, but almost half of the patients were lost to follow-up.  And it was not clear

from Cuoco's results how many patients actually got better and how many patients got worse.  Barrett was also a retrospective chart review with only eight patients.  And you heard from Plaintiffs' experts that retrospective chart reviews have bias and that they're hypothesis generating.

So, what happened when the hypothesis that rifaximin could treat IBS-D was tested?  Well, that was tested in the final piece of prior art, Pimentel 2006.  And it found that rifaximin at 400 milligrams three times a day for ten days was no better than placebo at treating the hallmark symptoms of IBS-D, which are abdominal pain and diarrhea.

Now, Norwich's expert did not consider any of the prior art references on the bottom part of this slide in the orange shading.  So, that includes the criticisms that SIBO causes IBS by Riordan, Jones, Parisi, Robson and Walters.  Norwich's expert did not consider Dr. Drossman's criticism of the Pimentel 2006 study.  Norwich's expert did not consider Dr. Quigley's publication just four months before the priority date, where Dr. Quigley stated that one cannot yet recommend either testing for SIBO or empiric antibiotic therapy in IBS and that the antibiotic dose and duration of therapy have not been established.

And Norwich's expert did not consider Dr. Vanner's statement just 22 days prior to the invention

date that there is insufficient evidence to recommend antibiotics for the treatment of irritable bowel syndrome at present. And, again, Norwich offered no rebuttal testimony, did not even discuss the GI drug advisory committee's skepticism that rifaximin was a drug that we know very little about to treat a disease that we know nothing or very little about. And Norwich offered no rebuttal to and did not even discuss the GI drug advisory committee's concern that rifaximin for use in IBS-D could harm the gut microbiome and seed tens of thousands of young people with antibiotic-resistant strains.

MR. KLINE:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Kline.

MR. KLINE:  I'll be addressing the polymorph patents, as you know.

THE COURT:  Yes.

MR. KLINE:  And there were three validity arguments on the polymorph patents, so I'll just walk through each one individually.

So let's start with the anticipation. The argument here is that the Cannata patent inherently anticipates the claims of the '199 and '206 patent. As Your Honor knows, this inherent anticipation is a very high bar. They need to demonstrate clearly and convincingly that each and every time, rifaximin Beta would have been produced by

the Cannata patent.  Not merely probably or possibly. That's not enough.

So let's just talk about what Cannata is and what the evidence that came in would demonstrate, and it clearly doesn't meet their high burden.  So, we have the Viscomi declaration, which was discussed quite a bit yesterday, and it showed clearly that rifaximin Beta was not produced in the batches that were tested in that Viscomi declaration and put in.  So, there you have an example of whether rifaximin Beta would be produced each and every time, and the answer is no.

So, it's interesting, even though Plaintiffs are -- Defendants have the burden of proof on this issue, they didn't recreate a single example from Cannata to try to show that rifaximin Beta would be made each and every time.  And so what they did is -- and they've admitted that these claim limitations that are rifaximin Beta with the specific peaks with the water content are -- none of that is disclosed explicitly in Cannata.

So, what they had to do was they had to show that each of those elements would be inherent.  And they haven't done that, but they try to backfill it with post-filing references.  They had -- they brought in the Viscomi 2008 paper.  They brought in the Braga 2012 paper, and then they brought in the Bacchi 2008 paper.  The flaw

with that argument is none of those references were using the process that is disclosed in Cannata.  So, it can't backfill for the same process.

And we heard testimony by Dr. Myerson that changing these -- any part of this process could impact the results of what you ultimately have as a result.  So, there's actually no evidence put in here that shows that an actual example that was recreated in this -- in Cannata would actually result in rifaximin Beta each and every time. And one of the problems with the Cannata process is, as Dr. Myerson explained, is there's a whole lack of detail in those -- in those examples as to the conditions as well as the solvents, the concentrations, and all that.  And that will have a dramatic effect on what you would ultimately achieve.

So, again, we don't think there's, certainly, sufficient evidence to show that the Cannata process inherently anticipates the claims of the patent.

So, let's move on to obviousness.  There's no dispute here that polymorphism is unpredictable.  And it's been long recognized in the law, and that's the antithesis of obviousness.  And the evidence showed the unpredictability of polymorphism here clearly.  We heard from Dr. Myerson, and we saw Norwich's expert on cross-examination, his own publications saying how

unpredictable polymorphism is.

So, what does this mean?  I mean, it means you can't have a reasonable expectation to obtain rifaximin Beta with the claimed XRPD peaks and water content at the time. And again, we really need to focus on the claims.  And that's what has to be obvious.  The testimony is that it's not possible to predict the existence or properties of a polymorph until you make them.  You can't predict it in advance.  And so, what you're left with is, as Dr. Myerson explains, is a trial and error method.  You try whatever you can.  There's several types of techniques that could be used.  You couldn't foresee which one would work.

And at the end of the day, you can't understand what is going on until you actually do the experiments.  And what's interesting here is the polymorphism of rifaximin was not known at the time.  Rifaximin was disclosed.  We saw it in the Cannata reference in the 1980s, but it wasn't until 2003 that the inventors discovered polymorphism, so we had 20 years where no one even knew rifaximin was polymorphic. And a person of ordinary skill in the art could not have a reasonable expectation of success in obtaining rifaximin Beta with the claimed XRPD peaks and the water content because they couldn't have predicted in advance it existed with those properties.  I think Dr. Myerson summed it up well on this issue is, you can't have a reasonable

expectation of success to find something you don't know exists.

And then on the last validity issue, we have the written description.  Again, this is an issue Norwich has the burden of proof on by clear and convincing evidence, and the issue is -- was very simple.  Would the disclosure of rifaximin Beta in the '199 and '206 patents claiming or characterizing rifaximin Beta with 12 characteristic peaks, would that disclose to a person of ordinary skill in the art that the inventors possessed an invention with only those same -- with three of those peaks in the claim?

Now, we didn't hear a whole lot from Norwich on this, but Dr. Myerson walked you through line by line where each of those elements matches up with the claim.  So, I don't think there's really any dispute that there was a written description of all those elements, but Dr. Myerson then went on and explained why you would pick these three XRPD peaks from the patent by comparing the disclosures, and I think that's important because everything Dr. Myerson testified about the written description comes straight from the disclosure of the patents and compares it to the claims and walks through how you would pick these three peaks to distinguish from the Alpha and the Gamma that is also disclosed in the '206 and '199 patents.

All right.  That's it, Your Honor.

THE COURT:  Thank you, Mr. Kline.

MR. KLINE:  Oh, I'm sorry.  We want to reserve the rest of our time to answer any questions you have.

THE COURT:  Do you want to say anything about -- does anybody on your side want to say anything about infringement or --

MR. KLINE:  Okay.  There were no infringement issues on my side of --

THE COURT:  Oh, true.  True.

MS. CLARK:  I will speak briefly on infringement, and first the HE patents.  The element that's in all of the asserted patent claims that I think is at the heart of the issue is the "12 months or more" limitation and whether or not Norwich's label would induce that element. And I think Your Honor's decision in *Sanofi v. Glenmark* goes a long way to helping us understand how to approach this. In that case, the claim was to administering a drug for at least 12 months.  And like here, the indication, dosage and usage were silent on the length of administration, but there, like here, the experts agree that the disease was a chronic disease; that in practice, physicians do, in fact, administer the drug indefinitely, including for 12 months or more; and that there were information on the label to suggest that, yes, you are administering this drug long term, including the clinical trials for HE, one of which was

six months and the other, where there was safety data, indicated that patients were treated long term for over a year.  And so, Your Honor's decision in that case is directly on point, and that was affirmed on appeal.

THE COURT:  And remind me.  I've had more than one Sanofi case, and I'm trying to recall this one.  What was the drug that was at issue there?

MS. CLARK:  Multaq or dronedarone.

THE COURT:  Right.  That's a heart thing; right?

MS. CLARK:  Correct.  It was for atrial fibrillation.

THE COURT:  Okay.

MS. CLARK:  I have the cite if --

THE COURT:  Well, that's all right.  Now that I do remember that, and I know about what it was -- do you have anything more to say about the 12 months?  Because I do have one other infringement question for you.

MS. CLARK:  Not on the 12 months for HE.  I would move to IBS-D next, unless Your Honor has questions.

THE COURT:  Well, so, actually, just one of the questions that kind of covers both of them is this administering thing.  And is your argument that the patient directly infringes and the label induces?  Is your argument joint infringement, which seems to me not to be a very good argument, or what?

MS. CLARK: The main argument is that patients directly infringe, and patients are induced by the label. The alternative argument was that patient's administering step is at the direction and control of physicians.

THE COURT: But haven't I -- because this comes up a lot. Haven't I had some cases before on this topic? And I think I've gone the way you've just said, but do you know? Have I actually decided this before, or have I just thought about deciding this before?

MS. CLARK: I don't know that you've decided this exact issue, and that's probably because it depends on the construction of "administering."

THE COURT: Yeah. And I've construed "administering" multiple times, and I think I've always construed it to be when the patient takes it, the patient administers, which would be consistent with what it is here.

MS. CLARK: And that is the construction that, essentially, both parties agree on. The experts construed it to be "introducing into the body," so swallowing a tablet.

THE COURT: I didn't take that to be a dispute here, yeah.

Well, go ahead and tell me whatever else you wanted to tell me about, I guess, IBS-D.

MS. CLARK: Yeah, so there's two IBS-D patents.

The first, the '667 patent, is the one that's directed to patients who are 65 years of age or older, and that's what the inducement issue focused on, was that patient population.

The Norwich label encourages and instructs physicians and patients to administer rifaximin three times a day for 14 days to treat IBS-D in adults, and there's no dispute among the parties that a patient who is 65 years of age or older is an adult. And so, this is a situation where the label instructs an infringing use, and there's evidence in the label that if there were any confusion, an adult includes patients who are 65 years of age or older because that's what's studied in the clinical trials. There were no differences in efficacy found. And getting an indication to a patient population 65 years of age or older is not a guarantee, so it is meaningful when reading the label.

THE COURT: Can't remember now. That's part of the reason I have these arguments. But in terms of the obviousness and non-obviousness of the 65-and-older claim, is any of the debate on that topic relating to the fact that they're 65 and older as opposed to a broader group of adults?

MS. CLARK: No, it was really focused on the use of rifaximin at the claimed dosage regimen and whether it would be effective to treat IBS-D, period.

THE COURT:  And so your argument on non-infringement, which obviously makes sense to me, is if I instruct you to give this to adults, if there was a limitation saying, yeah, but only female adults, it would be covered, even though you didn't say female and/or, you know, if you said only adults living in Delaware, you know.

MS. CLARK:  That's correct.  So the label doesn't have to exactly track the claim language.  And it doesn't need to exactly encompass -- so, you wouldn't have to put in the label and it wouldn't have to be limited to patients 65 years or older in order to induce that infringement.

THE COURT:  Yeah, that's kind of -- that was certainly my impression going in.

MS. CLARK:  And then the 12 months -- I'm sorry.  The durability of response for 12 -- durability of response comprising 12 weeks of adequate relief, the argument on that inducement is that patients are going to administer and are encouraged to administer 550 milligrams three times a day for 14 days, and the inevitable result of doing that, in at least some patients, will be a durability of response of about 12 weeks of adequate relief.  And that is clear from the clinical trials in the label, which found that in the durability of response trial, that patients did, in fact achieve that result.

THE COURT: And I'm sorry. I guess I have this mixed up in my head. The 65-or-older claim, does that require the durability of response?

MS. CLARK: It does not.

THE COURT: So, from your point of view, if you win one of the two of those on infringement, you don't really care about the other; is that right?

MS. CLARK: I wouldn't put it that way. We care about both patents, but, yes, you've distilled it correctly.

THE COURT: Okay.

MS. CLARK: That is all I have on infringement.

THE COURT: All right.

MS. CLARK: So I'll just reserve the rest of the time for any questions that Your Honor has.

THE COURT: Okay.

MS. CLARK: Thank you.

THE COURT: Thank you, Ms. Clark.

MR. LANDMON: Good morning, Your Honor.

THE COURT: Good morning, Mr. Landmon.

MR. LANDMON: I only have four slides, but may I hand them up?

THE COURT: Sure.

I see you've just combined all of your slides from the trial into four pages.

MR. LANDMON: That's what we were trying to do,

Your Honor.  We took your instruction less is more.

THE COURT:  That's good.  That's good.  You know, part of what's irritating about having 120 slides is how controlled we are by the slides.  That is it's not such a problem here.  Go ahead.

MR. LANDMON:  Sure.  Absolutely, Your Honor.

So, Your Honor, I wanted to start where we started when we started this trial because the evidence has borne it out.  What we've seen is that more than 30 years after rifaximin was invented, after it was in use around the world for the claimed uses, Salix came to the United States and filed a polymorph patent, and they did that right before they were getting approval for the 200-milligram product.

What we then learned is after the 200-milligram product rifaximin was approved in the United States, it was used immediately by physicians in the United States for HE and for IBS.  Four years then went by.  Four years of use, four years of disclosures of that use by Salix and others, and Salix finally went and filed the IBS and HE patents that are at issue here.

One of the issues that's squarely before this Court today is how many prior art uses, how many uses by patients in actual practice are enough to render a method claim obvious.  The patent system simply is not designed to reward those who just patent what's already out there in use

and compounds that already exist, and the Court shouldn't reward Salix here either.

So I wanted to, start Your Honor, with the HE patents, and if we could have the one HE slide up.  So this is just a slide that runs through where the prior art discloses the limitations because, in fact, Your Honor, despite what Plaintiffs' counsel has said, the prior art does disclose all the limitations that are in the HE patents.

The Bausch HE study, in fact, discloses each and every limitation of the claims except the six-month duration.  It disclosed how to prevent a recurrence of HE. It disclosed 550 milligrams twice daily.  It disclosed use with Lactulose, and it disclosed treating patients with a Conn score of 0 or 1.  Because of that, the obviousness combination with the Bausch HE study is pretty straightforward.

Is it obvious to extend the six-month duration to 12 months or longer?  And as you see in the combination here with the Salix presentation, the answer to that is a simple yes.  As we know, Salix repeatedly put forth Dr. Leevy out there, and Dr. Leevy went forth, and he said, "I've been treating patients for 12 and a half months.  It's effective.  It's safe.  It doesn't cause antibiotic resistance."  And what we learned in trial from Dr. Berg is

when a POSA would look at the Salix presentation a POSA would know that if you're treating someone for 12 and a half months, the patient is being treated for remission or to reduce the risk of an overt HE episode.  And those patients who are being treated for remission or to reduce the risk have a Conn score of 0 or 1.

So, all of that was set out in the Leevy -- sorry -- in the Salix presentation with the Leevy -- what Dr. Leevy was saying.  Dr. Brown even admitted that certainly Salix wasn't -- and we know this -- Salix wasn't attempting to mislead its inventors, and Salix believed in what Dr. Leevy was saying.  So, the attempt to discredit what was being said or to limit what was being said really doesn't pass muster in light of what Salix was doing.

Your Honor, turning to the second combination for this set of claims, it's the Leevy 2007 in light of common knowledge.  What we see there is the Leevy 2007 reference discloses, again, each and every limitation except for, in this case, two.  It discloses six months and instead of 12 months or longer, and it discloses 400 milligrams given three times a day instead of the 550, but all of that, again, combined with the common knowledge would have been obvious to adjust the dose in light of what was commonly going on.  Because what was Leevy doing?  Leevy was taking 200-milligram rifaximin that was the only rifaximin

available and giving it to patients.  So obviously, it had to be a multiple of about 200 that he was giving the patients at the time.

Dr. Berg testified -- and it's really uncontroverted -- that a POSA would have been motivated to decrease the number of administrations and to increase the amount that was given, so -- for patient convenience and patient compliance reasons.  And it would have taken no more than routine experimentation, as he explained, for a POSA to wind up with 550 milligrams given twice daily instead of 400 given three times daily.

In fact, Your Honor, no one here disputes that the 1,100-milligram total daily dose in the claims is any less effective or differently effective or would have been expected to be less effective than the 1,200 milligrams disclosed in Leevy, disclosed in the Salix presentation, and disclosed in a number of prior art references.

Now, what does Salix try to do with the Salix presentation?  They've tried to hide it from the Court.  We saw them at the pretrial conference with the motion in limine.  We saw them before opening statements.  We saw them making objections during the record to exclude that from the Court, but there's no dispute that presentation was publicly available.  There's no dispute, as Dr. Berg testified, that a POSA would have been interested in what Salix was

publishing because Salix was, as Dr. Berg said, the only game in town.  They were the only company with a rifaximin product on the market.  So, POSAs would have been interested in seeing whatever Salix was publishing about it, no matter where that was being published.

And you know interestingly, Dr. Brown called the Salix presentation lower-level evidence, and, actually, counsel put up for you on the screen the pyramid he used, but the interesting thing about that is it's still evidence that a POSA would have considered, even though it was quote/unquote lower-level evidence.

Your Honor, as to the motivation to combine the prior art references, it's pretty straightforward.  HE was known to be a chronic condition.  It was known to be a serious condition.  And what that meant is anyone who saw that there was administration for six months or longer would have been motivated to extend that because it is, like I said, chronic and people can die from it, so you want to extend that use to keep them in remission and to prevent HE from recurring.

I just want to turn to reasonable expectation of success.  So Salix opened this trial and we heard some of their experts say that using rifaximin for maintaining remission or for reducing the risk of recurrence was a hope or a hypothesis but not a reasonable expectation, they said.

But this is what we do know.  Their expert, Dr. Brown, was using it for patients.  He said that was good medical care when he was using it for patients.  So obviously, it was more than a reasonable -- sorry -- it was more than hope.  Dr. Berg -- sorry -- Dr. Brown had a reasonable expectation of success when he was using it for his patients.

Salix wants this Court, though, to adopt the heightened obviousness standard.  We keep hearing about there was no randomized, controlled clinical study.  Now, here's the thing, Your Honor.  When you run clinical trials, you may get FDA exclusivity, but you don't get a new patent for that, and, in fact, the law is clear.  All that is required is a reasonable expectation of success, not completed clinical trials.

And what's more important here with the facts here, all the experts agree, and we saw on the pyramid that was up, that a POSA does consider all of the evidence.  A POSA doesn't say, well, there's no controlled, clinical trial.  I'm not going to use this medicine.  In fact, they all did.  We heard from Dr. Brown -- I am sorry Dr. Berg, Dr. Schoolnik, Dr. Brown, and even Dr. DuPont saying that POSAs treating patients should consider the totality of the evidence.

And all of the evidence here shows that it would have been obvious, and there would have been an expectation

of success in using rifaximin to maintain remission or to reduce the risk of an overt HE occurrence.

Dr. Berg also explained why you would have had a reasonable expectation of co-administering Lactulose. We saw all kinds of prior art references using Lactulose in combination with rifaximin.

Now, we also have all the real-world evidence. You know, we keep hearing about these retrospective chart reviews and Salix arguing, well, a POSA wouldn't rely on those retrospective chart reviews, and some of them they said, well, those aren't really prior art because they were published after the priority date. But those retrospective chart reviews are evidence of actual doctors treating actual patients and following the claimed methods before the priority date, and that's the importance of that use.

We also know from the foreign labels. We know in Italy, we know in Mexico, we know in Hungary -- and these labels were, again, all publicly available -- that rifaximin was being used for HE with patients in those countries and throughout the world.

And we know that Salix was aware of this. We saw -- we put up those graph studies they did. And those studies are really interesting. When they surveyed doctors, gastroenterologists, they found that 77 percent had actually used rifaximin for HE and over 90 percent of them were aware

of rifaximin to use for HE.  All of that goes to support that a POSA would have had a reasonable expectation of success in practicing the methods that are claimed in the HE patents.

Your Honor, turning to the IBS-D patents, again, kind of generally, where did we start Monday?  What did the evidence show us?  We know that Dr. Pimentel filed a patent back in 1999.  That patent disclosed the use of rifaximin to treat IBS.  That patent appears on the Xifaxan label as covering the claimed use of IBS-D.  Dr. Pimentel even wrote a book.  In that book, he published a protocol for how to use rifaximin to treat IBS-D.  That book was never before the Patent Office.

Now, before the claimed priority date of February 26, 2008, rifaximin was being used off label throughout the United States for IBS-D.  We saw Dr. Weinstock describe the use of rifaximin 1,800 milligrams for 14 days.  And again, we saw survey data.  That survey data showed 74.4 percent, almost 75 percent, of the gastroenterologists had personally prescribed rifaximin for IBS.

We see it in the published literature.  We saw it in the market data.  And Dr. Harary, our expert, walked through that art.  He walked through the published trials.  He walked through retrospective studies.  He walked through

what was being used in clinical use.

And here's what was interesting here.  Salix actually published the results from its clinical trial saying that they had met the primary endpoints using 550 milligrams dosed twice a day for 14 days.  Again, this is all in the public record.  It wasn't a secret.  This was all known to POSAs.

So if we could just have that slide up on the '569 patent, Your Honor, again, I won't run through this in great detail, but we have the prior art references here.  We see the combination.  There's two different combinations to consider here for Claim 2 of the '569 patent:  Pimentel 2006 in light of the RFIB protocol and Cuoco in light of the RFIB protocol.  And here's what stands out when you look at these.  We see administration between 1,200 and 200 -- 2,200 -- sorry, Your Honor.  Between 1,200 and 2,200 milligrams per day.  We see administration between one and three times per day.  We see administration for 10 to 14 days, and we see the claimed durability of response.

So, what's really at issue here for the IBS patents is whether a POSA would have been motivated to improve the known response that it was getting and use the known elements to adjust the dosing schedule with a reasonable expectation of success.  We saw evidence that Pimentel 2006 suggested that a higher dose than the 1,200

milligrams per day he was using might be useful for patients and effective. And the prior art established this known 1,200- to 2,200-milligrams-per-day dosing. We also saw in the actual real world the viability of this range, the 1,200 to 2,200 milligrams.

So, it would have been easy for a POSA to optimize this range in light of all the prior art. I mean, we saw Jolley and Weinstock and others demonstrate that you could adjust within that range and achieve -- excuse me -- achieve effective treatment. We saw Lauritano and Scarpellini establishing that there was a dose response relationship when they were talking about SIBO and eradicating SIBO by increasing the dose.

So, here's the key to all this. We've got these claim -- these different dosing ranges in the prior art. We know that they're effective. So then have you to look at what the law requires. And here's what the law says: If you have a workable range in the prior art, which is what we have here, we have a range that was disclosed as being effective, the law requires the patentee to point to the spot in the range that -- the spot they chose within that range in their patent was critical and provided a difference in kind, not a difference in degree. But neither Plaintiffs nor their experts have said that. No one has come forward about the magic of 1,650 milligrams three times a day.

There are no critical results, and the prior art demonstrates why that wouldn't be the case.  When you look at all the different dosings that were given and you look at all the results the prior art shows why the point they chose was not surprising for a clinical trial, or critical. Running a clinical trial may be good business, but it's not a way to get a patent.

Just turning quickly to the next slide, this is the '667 patent, Claim 3.  The arguments are largely the same, although the art is slightly different.  This is the claim, as Your Honor was just talking about, with 65 or older.  We had the Pimentel 2006 reference in light of RFIB 2001.  And the Barrett reference, again, in light of the RFIB 2001.  The same motivations would apply here.  We see the same disclosures.

Here's what's interesting.  Plaintiffs, again, they haven't shown why treating a patient that was over 65 was somehow unexpected or somehow surprising.  They added that claim limitation because Pimentel 2006 had enrolled patients between 18 and 65 years old.  That's why they added it, to get around Pimentel, but it's not patentable, and it's not inventive because they have proven nothing that was surprising or critical about that population.

I do, Your Honor, want to turn to just a couple kind of arguments that Plaintiffs have raised for both the

HE and the IBS patents.

One is the 550 milligrams. We've heard from Salix's lawyers and their experts that there's something unique about the 550. But here's the key: We didn't hear from any inventors. We didn't hear from any experts who said that the 550 is anything special or has any special properties. And the reason we didn't hear is because, as we know, a POSA would have arrived at that through routine experimentation, which as a matter of law means they're obvious. In fact, we heard the inventor Lorin Johnson testify that the reason he thinks they did the 550 was to get a dosage form that was more convenient for patients, that would help patient compliance. And that's the same motivation that Dr. Berg and Dr. Harary had testified about. Every POSA would have been motivated to do that.

Interestingly, Salix's experts, when asked on the stand, both of them said they have no idea why the 550-milligram dosage form was chosen. We do know one thing, though, from Salix's own records. We know in Salix's own records, and we talked about this with Dr. Brown, we have the slide where they said we need to develop a 550 dosage form so we can prevent competition from the 200 milligram. And what that meant is they were concerned that if they used the dose -- a pill that was 400 milligrams or a pill that was 600 milligrams that doctors would have just taken the

200-milligram pill and given it two or three times to a patient. They wanted to prevent that. And again, the patent system is not designed to reward this gamesmanship.

I want to just quickly address antibiotic resistance. As you know, Salix has raised that as an issue, both to rebut reasonable expectation of success for the HE patents. They've used it for secondary considerations of skepticism and unexpected results.

All of the discussion on antibiotic resistance hinges on the testimony of Dr. DuPont. And what we know about Dr. DuPont is he's an infectious disease expert whose career has been dedicated to studying antibiotic resistance. He doesn't treat HE patents. He didn't treat IBS patients. We know -- and this is the biggest rebuttal to antibiotic resistance -- that POSAs around the country were administering rifaximin as set out in the claims. Obviously, they couldn't have been concerned about antibiotic resistance. And the reason is clear. We heard from all the experts, including Plaintiffs own experts, that when they make a dosing -- an administration decision, a prescribing, decision for a patient, they look at the patient in front of them, they look at their condition, and they evaluate the risks and benefits. When you have a disease like HE, which is deadly, or a disease like IBS, which Dr. Schoenfeld testified, can be life-altering for

some patients, you need to find a drug product to administer to them, and POSAs are going to do that when the risks are low.

And, in fact, Dr. Schoenfeld testified -- well, Dr. Schoenfeld testified at the end of cross that he had patients that he looked at and he said, yeah, I was concerned about antibiotic resistance. And then he was asked, well, did you administer rifaximin for IBS? And he said, yeah, I had -- I had a set -- he said I thought it was ten patients. He said they had "severe symptoms." They had "failed multiple other therapies," but they were "suffering so much." So what did he do? He administered rifaximin because he said he wasn't concerned about antibiotic resistance as much as he was concerned about treating his patients.

We also know there are a wealth of publications that said there was no resistance with shorter term administration of rifaximin. There were no publications that said there were concerns, and Dr. DuPont didn't identify any publication saying there were concerns about clinical resistance with using rifaximin long term. And we know from the Salix presentation that we've been talking about from day one that Dr. Leevy was administering for over 12 months, told the world through Salix and promoted by Salix that there was no antibiotic resistance.

For the IBS-D patents, Salix can't credibly say that antibiotic resistance is a concern because the patents are directed to 14-day administration.  And we asked Dr. DuPont about the length of administration that you'd be concerned about.  He said, well, I had studies that were short term.  I think they were in the 10- to 12-day range.  All of those studies show that resistance didn't develop.  So I then asked him, so when would you be concerned that long-term administration would be a concern?  And he said, well, somewhere between two to three months or longer.  Obviously, 14 days is shorter than that, so there really is no credible concern about antibiotic resistance for IBS.

Your Honor, just quickly turning to secondary considerations, the plaintiffs have asserted long-felt need, failure of others, and skepticism.  All of these fail in light of the fact that POSAs around the country were already doing this.  There couldn't have been any long-felt but unmet need.  It was met by rifaximin.  There wasn't a failure of others.  In fact, rifaximin was being used for HE and IBS.  And there wasn't skepticism because doctors were doing this around the country at the suggestion of Salix.

The other thing I thought was very interesting in light of long-felt but unmet need is Dr. Brown actually testified, he said for HE, "I would actually say we still have an unmet medical need."  Well, if there's still an

unmet medical need, then certainly the claims didn't meet that need.

Quickly, Your Honor, on written description for the HE patents, Dr. Berg talked about how the specifications do not support administration of rifaximin alone. The specification only found effective results when Lactulose was co-administered, so the claims to rifaximin alone -- method of treating with rifaximin alone fail for written description.

On the IBS patents, the claimed requirement of a durability of response comprising about 12 weeks of adequate relief of symptoms, that was added during prosecution to respond to objections by the examiner. But the specific response now claimed was not disclosed in the specification. And what we heard from Dr. Schoenfeld is he said, well, there was this -- there was this prophetic example. There was this prophetic study, and he actually put up the study and we talked about all the different stages of the study. He said it was prophetic and the inventors had not yet performed it, yet he testified that you wouldn't know if it would work unless you performed it.

Well, here's the thing. Dr. Schoenfeld is saying for obviousness you don't know if it works. You don't know if you have reasonable expectation unless you have results from a clinical study. But for written

description, he says a prophetic example without results is enough.

On the IBS patents, we also have invalidity arguments based on indefiniteness, and there's two aspects of this. One is the adequate relief. When does a subject have adequate relief? The specification says it's a subjective test. Dr. Schoenfeld we heard repeatedly talk about how it's really subjective and up to the patients. And Dr. Schoenfeld, maybe famously, said, you know it when you see it. So you know an adequate relief is obtained when you see it. That purely subjective test is not sufficient to meet the definiteness requirement of patent law.

We also have the durability of response limitation that -- of about 12 weeks of adequate relief of symptoms. Again, Dr. Schoenfeld -- well, the patent doesn't define whether that has to be continuous for 12 weeks, and Dr. Schoenfeld said it doesn't. You can have time in that where the person doesn't have adequate relief. So, he was then asked, well, how long of a period of time? And he said, well, it's some time -- it's some point greater than zero and some point all the way up to 12 weeks. Again, that doesn't meet the definite requirement when you claim 12 weeks of adequate relief of symptoms.

Your Honor, just turning to the non-infringement, focusing first on the HE -- well, only on

the HE and IBS claims for non-infringement, there's an overarching question and Your Honor asked.  Who is the direct infringer here?  We've had all kinds of testimony.  It's the patient.  It's the patients with the doctors.  It's the doctor.  It can only be the patient who administers.  Everyone agrees the patient is the only one who introduces the tablet into the body.

So then the question is:  Does the patient read the label and can a patient understand the label from an inducement perspective, or is there some sort of joint infringement?  From the joint infringement perspective -- well, let me back up.  On the IBS patents, Dr. Schoenfeld testified that the patient is infringing, i.e. the patient's taking it, but the physician is encouraged to infringe.  So, he's not even saying that the patients are encouraged to infringe because he admitted that patients don't read the labels front to back.  They might skim them and they might read some smaller sections of the labels.

But, Your Honor pointed out Salix does have this theory of joint infringement.  As Your Honor is aware, that requires direction and control from the doctor to the patient.  And the law has set out that that means that the doctor conditions some benefit to the patient for the patient's performance, but what we heard is that that doesn't happen here.  While doctors do give instructions,

and we heard the experts say, yeah, no, I do give instructions to my patients, Dr. Brown, he conceded that even if the patients don't follow his direction, he continues to offer the prescriptions because he wants to help the patients, hopefully save their life, and extend their life.  So clearly the joint infringement breaks down there and is not met as a matter of law.

Now, on the inducement aspect of the case, whether the label induces patients to take the activity, there's a couple of things that are interesting.  First is what makes this case unique from an inducement of infringement?  I'm sure this Court sees plenty of cases on inducement.  Most of those cases involve -- excuse me, Your Honor -- involve where the indication of the label -- sorry -- where the patent reads on the indication of a label.  So the patent is a method of using aspirin to treat a headache.  The indication says use this aspirin to treat a headache.  What we have here on both the HE and the IBS patents is that the indication, which may be something that patients read, the indication -- the patents do not read on the indication.

So instead, Salix has gone fishing into the labels.  As you know, it's a pretty extensive label. They've gone fishing for different areas where they say, well, that proves infringement or that proves infringement

or that would encourage somebody from disparate parts of the label, often in really detailed scientific clinical studies.

On the HE patents, the claim limitations of 12 months or longer, the administration of Lactulose, the maintaining remission and Conn score at 0 or 1, Salix has not demonstrated that the label would encourage a patient to follow those.

On the Lactulose, it's really an open-and-shut case. Dr. Brown said that the label, at most, says to administer it with or without Lactulose, and we know from the *Shire v. Amneal* case, that's not enough to demonstrate infringement.

On the IBS, there's really two claim limitations that are at issue, the 12 weeks for adequate relief of symptoms and the treating of patients 65 or older. The 65 or older is more akin to the with or without argument we were just talking about. And the durability of relief, again, it's going digging in the label to find something that, frankly, isn't there and, certainly, patients wouldn't understand.

So, Your Honor, I want to just quickly touch on and finish with the polymorph patents. Again, the case on the polymorph patents is unique. You know, we've heard Salix's counsel say, well, polymorphs, you know, they're always valid, Your Honor, because they're a unique compound.

You know, one, that's not true.  There have been cases finding polymorph patents invalid.

But, two, and more importantly, this case is different because rifaximin, as we know, was disclosed in Cannata and Marchi.  Not only rifaximin was, but the way to make it, how to crystalize it, and the process that you would want throughout that.

And if we can have the slide up on this.

So we heard a lot of discussion yesterday about -- this is from the Viscomi article.  Your Honor might remember Viscomi was talking about how you can make the different polymorphs.  And we have the Viscomi declaration.  In the Viscomi declaration, we saw that he took the prior art, he followed the prior art, and he said this is what I got.  He said sometimes I got Beta, sometimes I got mixtures of Alpha and Beta, sometimes I got compounds that didn't include Beta.  I think he said he got Alpha and he said Delta and Epsilon, but he got other compounds.

So Plaintiffs have taken that and said, see, Your Honor, this doesn't meet inherency because each and every time we follow the prior art, you don't wind up with Beta.  But here's what the testimony demonstrated yesterday by Dr. Zaworotko that Dr. Myerson didn't address at all.  And that's that the only way to get Alpha, Delta and Epsilon, which were in the Viscomi declaration that he

submitted to the PTO, was to at one point in time have Beta. And the reason for this is if you follow the prior art, you're going to have wet rifaximin because that's how you make rifaximin, or at least the process of making and then crystallizing it, is you start with wet rifaximin. And Dr. Viscomi says when you have the higher -- the higher moisture contents, certainly above six percent -- and in his deposition, we heard testimony that probably even down to about four percent -- but all up until that time, you have rifaximin Beta.

So, what we have here is when Viscomi took the prior art and was -- and followed those steps in the prior art, he had wet rifaximin. He had Beta in his possession. He just didn't always test for it because he was continuing to dry it. If he had stopped the drying process at any time before it fell below six percent, according to him, according to his publication, according to his deposition testimony, he would have had Beta, and his declaration would have said, I had Beta. But he waited, he dried it longer, and then there was some times there wasn't beta. But that doesn't take away from the inherency point, that at some point as he was running those experiments -- in other words, at some point when you follow the prior art, you're going have rifaximin Beta in your possession. That is the definition of inherency, and that is why the polymorph

patents are invalid.

And just quickly, Your Honor, on the 112 for the polymorph patents, the issue there is that the patents disclose a species of rifaximin called Beta.  It discloses that with 12 characteristic peaks.  Then they tried to claim a genus with only three peaks.

So, Your Honor, all the evidence is in.  We think there's clear and convincing evidence that all the asserted claims are invalid.  Salix has failed to prove by a preponderance of the evidence that Norwich will induce infringement of the HE or IBS patents.  We request that the Court enter judgment accordingly for Norwich.

And I do want to thank the Court and all of its staff for bearing with us this past week.

I'm happy to answer any questions, Your Honor.

THE COURT:  So in the -- in relation to the HE patents and the various uses that have taken place before the priority date and Dr. Pimentel or other people talk about, were any of those done to prevent HE?

MR. LANDMON:  So a couple things on that.  The Salix presentation and Leevy were certainly -- and the testimony showed that -- were certainly preventing HE from happening because it was over a 12 and a half month period of time.  If he was -- and then Dr. Berg explained this.  The patient would have been in acute HE and eventually would

have been in a coma and would have died.  So the continued administration along those 12 and a half months shows that Leevy was trying to prevent an HE episode from occurring and trying to reduce the risk from that occurring.

We also see in the Bausch HE study, which is our primary reference there, that actually discloses maintaining remission.

THE COURT:  Well, no.  That's -- so the studies -- that was a study design; right?

MR. LANDMON:  It -- right.

THE COURT:  So, my question was more just when you were addressing the first point which is, you know, were these doctors who were trying to do something about HE, were they -- the cost-benefit analysis that they were doing, was that treating it, you would think the cost-benefit ratio was more skewed towards trying anything --

MR. LANDMON:  Right.

THE COURT:  -- then the patient's happy, or let's give it to the patient for a year and see what happens?

MR. LANDMON:  Yeah, so Dr. Berg testified that multiple prior art references when you saw the administration, that those references were disclosing maintaining remission, preventing an acute HE episode from happening.  He testified that he personally was treating

patients in that mold. And maybe most importantly, Dr. Brown, and I asked him about this, he said he would have patients who would be having an acute episode. He would give them rifaximin, but then he would keep them on it to maintain their remission.

THE COURT: I thought that was for, like, three or four days.

MR. LANDMON: He said it was for a shorter period of time. No, it wasn't for the course of a year. I mean, that's different than all these other doctors who are out there saying it and doing it longer, according to Dr. Berg, but for that period of time, he was certainly doing it to maintain remission. I mean, that's what he said. But it was not -- yes, Dr. Brown testified that he wasn't doing it for 12 months or longer.

THE COURT: And so, the -- switching to the IBS-D here. The --

MR. LANDMON: Your Honor.

THE COURT: I'm sorry. Yes.

MR. MURPHY: I'm sorry. I shouldn't have interrupted you. I just didn't want to leave something out there. Leevy 2007, which is another reference on HE, he said that the goal of this treatment was to prevent hospitalizations. And what that means is he is preventing HE episodes from happening because when you have an HE acute

episode, you end up being hospitalized because you're going into a coma and you're in this severe state.

So Leevy 2007 was also disclosing, you know, again, that for a six-month period of time, not 12 months or longer, but for that period of time, that was the goal of his administration, was to maintain remission, i.e., to prevent HE episodes from happening.

THE COURT: All right. In terms of the label in regards -- actually, I guess this goes for both the HE and the IBS-D patents -- the label was recommending, instructing, encouraging the treatment methods that are described in the label; right?

MR. LANDMON: I would say it's -- I would say the testimony has shown us that the label is recommending, encouraging, what's in the indication. It's not necessarily recommending or encouraging some small detail that's in the clinical study section, especially for a patient.

I mean, if the Court is evaluating, which I think the Court must in light of the evidence, whether a patient is encouraged, I think the testimony has shown that a patient certainly isn't going word-for-word of the 25 pages or so and digging out different parts of what might be in, like, a detailed clinical study and saying, well, I guess I can interpret that based on what's happened with X.

The patient, I mean, Dr. Schoenfeld he'll

testify that they only look at selected areas, but the patients are primarily focusing on things like the indications, and neither of the indications for IBS or for HE track the claims.

THE COURT:  Right.  I understand your argument that they're not co-extensive with the claims.  Is it something where the channels of instruction are limited to what the patient gets directly from whatever a patient does for herself, or does it make sense that if the label is instructing doctors and patients, and Norwich knows that part of what the doctor's going to do is -- is pass the instructions along to the patient, so the patient then ends up having -- getting instruction from Salix -- or sorry, Norwich, both directly and indirectly, isn't -- it would seem to me to make sense that both the intent and the actual inducement, you're not limited to the direct channel.

MR. LANDMON:  So according to the case law, Your Honor, for inducement to occur, the person doing the inducing, so here Norwich, has to directly instruct encourage, recommend to the infringer.  So, if there were an instance where the infringer is the patient, then it's got to be an activity that Norwich is doing that, you know, instructs, recommends, encourages the patient to do it directly.

Where you do -- and there are cases that have

the doctor being involved, but that's an instance where there's still infringement.  You know, if Plaintiffs are arguing -- and I have to admit sometimes I'm not sure what the argument is, but if the plaintiffs are arguing that Norwich provides information to the doctor and then the doctor provides information to the patient, then they have to prove that there is joint infringement between the doctor and the patient that both the doctor and patient are doing the step and that the doctor has the control over the patient set out in the law, which is this conditioning something the doctor is doing on the patient performing the step.

THE COURT:  All right.  So, one of the things that I've never actually heard before this trial, though it seems to me to make sense, was the argument by the plaintiffs that a POSA would evaluate some prior art as being more persuasive than others for reasons that haven't been testified to.  Do you agree that that is, in fact -- you don't have to agree with exactly what I said, but as a general principle, do you agree that, yes, that's a proper thing to take into consideration?

MR. LANDMON:  So, I think the evidence has demonstrated from experts on both sides that -- that physicians, which are pretty much the POSAs here, do consider the totality of the evidence, and they weigh the

totality of the evidence.  And what I think we've heard with both IBS and HE, that there were no controlled clinical studies, so then you looked at everything else.  And I think the doctors have testified that there was so much out there on the use of rifaximin for IBS, for HE, that they were -- that they would take that and they would consider it.

And, in fact, not only do we have the experts, we have all this evidence all of these doctors around the country and around the world doing it.  So, you know, the notion that you started with, Your Honor, yes, I think that's correct that they do consider all of the evidence and part of it -- some evidence may be more weighted than others.  You know, I think we saw in the pyramid we saw that there was discussions about Mas and Bass.  We had Dr. Berg.  Dr. Berg testified about those, about what those did and didn't actually disclose.  And even the fact that they -- they would have encouraged somebody to use rifaximin.  Certainly, we talked about all the disclosures, you know, in the Leevy 2007 reference and the Salix presentation that would have led somebody.

So, going back to where you started, and sorry for the longwinded answer, yes, I think it is right in this instance the way that physicians -- that some evidence may be more weighty than others, but when you're sitting as a physician, trying to treat a patient, you are also

considering all this other evidence.

THE COURT: So one of the premises that Salix directed that your general argument was hindsight bias, and I can't say that I can recall all the different -- I mean, I couldn't recall what all the different gray boxes on one of Salix's handful of slides saying that, essentially, your people just ignored whatever it was. They took a much more, I guess, fulsome view of what the -- what was out there in the prior art, what the totality of prior art was, and that things that helped them were not addressed by your side. I'm not looking for a point-by-point rebuttal here, but what do you have to say about that?

MR. LANDMON: I just think that's not true. I actually meant to say this in my remarks. It's not the fact that our experts didn't consider. Our experts did consider all of the art that -- and I forget exactly what ones were up on that slide that Plaintiffs spoke about. Our experts did consider it. But they said you need to consider it again amongst the totality of the evidence, amongst all the Leevy disclosures for HE, amongst all the Pimentel disclosures for IBS, amongst Salix's disclosures of their clinical study protocol for HE, of their clinical study results on IBS. And then, you know among the use.

I mean, we're in a situation here where every doctor that's testified before this Court that treats HE or

treats IBS said they were doing it.  You know, it's kind of -- it's a very unique situation that we have here, Your Honor.  So it's not that they didn't consider that there might have been other references out there, and I know on HE Mas and Bass, Bass and Mas were both spoken about.  Dr. Berg addressed both of those.

THE COURT:  Well, so the two things in particular that I was -- that I don't recall your experts addressing, but I could be wrong about that, one of them was this comment by Dr. -- I think it was Drossman who -- Plaintiffs' expert -- said, you know, world famous gastroenterologist or something like that.  Did your person address that, or do you have any comment on Dr. Drossman's comment if your people didn't address it?

MR. LANDMON:  Sorry, Your Honor, but I'm going confer with Mr. Murphy, and, actually, I'll let Mr. Murphy address that.

THE COURT:  I'll be happy to have Mr. Murphy answer it if that works better for you all.

MR. MURPHY:  Good morning.

THE COURT:  Good morning.

MR. MURPHY:  Regarding Drossman, that was published in --

THE COURT:  Sorry.  Are you Mr. Murphy or Mr. --

MR. MURPHY:  You may have referred to me a

couple times as Mr. Moore. I didn't want to correct you, and but it's Mr. Murphy.

THE COURT: You said -- I guess sorry about that. I do try to call people by their right names when I know what they are. So, I can understand your hesitation. I once practiced with a guy who as was called routinely by the judge by the name of a different guy that we worked with, and he never said anything about it because he figured if he ever got in trouble, the other guy would get blamed. But, yeah, you should.

MR. MURPHY: Sure and --

THE COURT: In any event, so it's Mr. Murphy.

MR. MURPHY: Mr. Murphy, yes.

THE COURT: Okay.

MR. MURPHY: On Drossman that was published in 2006 after Dr. Pimentel's article. And that was a comment to Dr. Pimentel's article. Dr. Schoenfeld described it in 2007. We saw Dr. Schoenfeld describe his slide presentation 17 days before filing the patent on behalf of the advisory counsel meeting. We talked about that in his cross, where he was going through all of the evidence. Collecting it, I think he said. Dr. Drossman's article didn't appear there, and on the article itself, the critique never said that rifaximin wasn't efficacious for the treatment. He said, you know what? We need to review some more evidence as we

think about how we want to use this for this indication. And if you take a deep dive into Dr. Drossman's article -- and I grant you, Dr. Harary did not address it in his testimony --

THE COURT: Right. Right. So that kind of -- yeah, I mean, maybe in your brief you will tell me what a deep dive is but --

MR. MURPHY: I can tell you now.

THE COURT: -- but then the words "attorney argument" would be floating around, not that I'm trying to help them write their brief.

MR. MURPHY: I can say this. It's generally consistent with Dr. Pimentel's protocol that he put in his book that we talked about, and there's a flowchart. Your Honor may recall it. Conducted breath test, administered antibiotic, give rifaximin.

THE COURT: Okay. And then the other thing I was curious about, which I don't think your people addressed which Ms. Clark referenced this morning, was the two people on the gastroenterology advisory board to the FDA who -- and I'm shorthanding it here -- expressed skepticism about the antibiotic implications of HE treatment. Did any of your people address that, or why is that not actual skepticism that I should take into account?

MR. MURPHY: I can speak for IBS-D, and I'll let

Mr. Landmon speak for HE just because I'm not as familiar.

THE COURT:  Well, I think it was more directed to towards the HE because it had to do with the long term. I mean, I do think -- or that was my impression.  And Ms. Clark, when she was talking about it talked about it referencing HE, so I don't care who addresses it, but I think HE is the more relevant consideration.

MR. MURPHY:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Murphy.

MR. LANDMON:  So, Your Honor, Dr. Berg addressed it.  He said that if you look at that they then said you're approved and you can get back to us in a post-marketing study.

THE COURT:  Well, they said you're approved, but then didn't she say you're approved, like, years later?

MR. LANDMON:  Not on HE.  I think that was more on IBS.  Maybe I'm confusing.

THE COURT:  Well, when was HE approved?

MR. LANDMON:  Actually, I don't know.

MS. CLARK:  Your Honor, it was March 2010 and --

THE COURT:  Oh.

MS. CLARK:  -- the second clinical trial that Salix was required to do, RFHE 3002, which was the long-term study, that interim analysis which had long-term data was before the FDA when it approved it.

THE COURT: All right. Well, so isn't that actually good evidence of skepticism, you know, they've got the patent or even the FDA approved it, and people were still saying is there a problem here.

MR. LANDMON: Well, I think it's -- so I think it's the FDA saying we want to just watch this and get the data. And saying -- I can't remember if it's four or five years, but they basically said, Salix, get back to us in four or five years. Obviously, there wasn't a big problem or they would have said we can't approve you yet because we want to make sure it's not going to cause clinical resistance, which we know no one says it would cause, or resistance throughout the population. So, I mean, that's key, and Dr. Berg -- Dr. Berg talked about that and said when he looked at it, obviously, he wouldn't have been concerned.

And kind of going back to the claims, and it's been a little lost in the scope of the trial, the claims don't talk about antibiotic resistance. The claims talk about --

THE COURT: But --

MR. LANDMON: -- being effective.

THE COURT: I have to think about that one. Effectiveness, I think maybe I'm confusing this with utility. I mean, you can -- I remember this, some famous

case where they said something useful, even though it killed people.  The effectiveness that you're talking about here is preventing HE or maintaining remission or whatever the sort of defined thing is.  And I guess it maintains remission whether or not it contributes to the world's antibiotics problem.

MR. LANDMON:  As long as it doesn't present clinical resistance, and no one contends that it does.  I mean, including Dr. DuPont.  He didn't come up and say that it was going to lead to -- and by clinical resistance, I mean within the patient causing rifaximin to not stop working because of mutations within that patient.  And all of the evidence has shown that no one was worried about that with rifaximin, and given --

THE COURT:  But that's how it would be relevant to the claims, which is they wouldn't be effective in maintaining remission if it caused clinical resistance.  Okay.

MR. LANDMON:  Yes, Your Honor.  That's correct.

MS. CLARK:  If I may just make one clarifying point.  Most of the resistance testimony went to the motivation prong because we recognize that reasonable expectation --

THE COURT:  I'm sorry, Ms. Clark.  I missed -- I missed the key word in your -- can you just go back a

sentence and start over.

MS. CLARK:  Yes, Your Honor.  The resistance testimony really went more towards the motivation prong because we recognize that the reasonable expectation of success must be a reasonable expectation of what is claimed. And resistance or lack thereof, other than clinical resistance, which goes to efficacy, that's not claimed, so that really went more to the motivation prong.

THE COURT:  Okay.  Thank you.  All right.

I don't have any further questions, Mr. Landmon. Thank you.

MR. LANDMON:  Thank you, Your Honor.

THE COURT:  Is there anything further you want to say, Ms. Clark?

MS. CLARK:  Yes, Your Honor.  Thank you.

With this whole off-label-use issue, Plaintiffs agree that there were some off-label uses to treat HE and to treat IBS-D, but we don't have evidence of how pervasive that was.  Dr. Berg admitted that he didn't even try to figure out how many times it happened, but at the end of the day, just the fact that there were uses doesn't mean that they worked, and this -- it doesn't mean that they were of the claimed invention.

What Dr. Brown testified was that he used rifaximin in desperate situations where patients had no

other options.  Everything had been tried, and you couldn't do nothing.  And so, he hoped that rifaximin would work.  But he explicitly testified that he didn't have a reasonable expectation that it would work.

Dr. Schoenfeld said the same thing.  Yes, I used it in desperate situations when my patients came to me and said, you know, Doc, I am struggling.  We've tried everything, and he said, let's try this experiment with rifaximin and see what happens.  But he had a hope that it would work, but not a reasonable expectation.

And we've seen this recently with COVID-19.  Patients are desperate.  Let's try what we have.  Let's try hydroxychloroquine.  I don't know how many times that was administered -- and you heard Dr. Brown say that he administered it on the COVID board -- but that doesn't mean that we reasonably expected that hydroxychloroquine was going to work.

THE COURT:  But it does sort of -- it isn't all -- to the extent that people were trying what was -- what arguably was made a claim by the patents, that seems to be real-world evidence of a motivation to combine, don't you think?

MS. CLARK:  At most, it's a motivation to try, but obviousness to try is not the standard.  There still must be a reasonable expectation of success.

THE COURT: Well, yeah, yeah. So that's the -- so when I say motivation to combine, I was kind of breaking it into halves. There's motivation to combine. There's reasonable expectation of success. Motivation to try and motivation to combine, in this context, aren't they the same thing?

MS. CLARK: Under the law, I think they're sort of mushed together. But regardless, it has to be a motivation to do what is claimed, not just some general motivation.

THE COURT: No, I yes. Sorry. Go ahead.

MS. CLARK: No, that's fine.

And then the last thing I wanted to say is simply that a hope and a hypothesis is not a reasonable expectation of success, and, again, that's what Your Honor found in the Multaq case *Sanofi v. Glenmark*, which, again, was affirmed on appeal.

THE COURT: Yeah. Okay. Anything else, Ms. Clark?

MS. CLARK: No, Your Honor, just to hand up the slides that we used.

THE COURT: All right. That would be fine.

(Discussion held off the record:)

THE COURT: Actually, Ms. Clark, maybe I did have one other question, which is when I was asking

Mr. Landmon some questions at the end about people who were -- you know, for example, Dr. Leevy saying he treated some number of patients for 12 and a half months or up to 12 and a half months, and that this was -- only be inferred that it had a preventative aspect.  Do you disagree with that?

MS. CLARK:  Yes, we do because there are different types of HE, and Dr. Leevy did not say which one he was trying to treat, and it would make perfect sense that if he were treating persistent HE, which is not what is claimed, that he would continuously administer rifaximin. So that element is not disclosed by Leevy, even taking what he says as true.

THE COURT:  And the way, you know, claims are trying to treat episodic, if that's the right word, HE, is simply because the more persistent HE, there would be no remission to be talking about.

MS. CLARK:  That's right.  And the construction, the claim construction of HE in this case includes episodic.

THE COURT:  Let me see if I had another question.

So, the question on inducement of patients, because -- because I would have a hard time saying that the doctors control the patients.  And the -- Mr. Landmon saying, well, the only inducement that counts that is not clinical or something is sort of directly from the Norwich

to the patient.  Is he right about that?

MS. CLARK:  I would want to look at the case law to really give you a good answer to that, but my impression of it was that you were right, that it does not need to be a direct line because at the end of the day, what's causing the patient to do what they're doing is the label.

THE COURT:  Yeah, that's -- well, as I've said, that would be my instinct, but, obviously, probably everybody is going to brief it, so I can figure out whether my instinct was right or wrong or up in the air.

Okay.  Thank you.

MS. CLARK:  Thank you, Your Honor.

THE COURT:  All right.  So did you all have a chance to talk about briefing and the like, Ms. Jacobs?

MS. JACOBS:  We have.  I'm sorry.  We have, Your Honor.

THE COURT:  So what did you come up with?

MS. JACOBS:  We have agreement, subject, of course, to Your Honor's approval, but what we agreed to would be two rounds of both briefing and findings.  So, the first round would be simultaneous opening -- opening, briefs, and findings on May 5th.  And that would give us a little time to get the transcripts in order, as Your Honor suggested.  And answering briefs and findings on June 9th.  And the openings on the plaintiffs' side would cover

infringement and secondary considerations.  On Norwich's side, it would be invalidity.  And the answering briefs and findings for Plaintiffs would cover validity, and for Norwich would cover non-infringement and secondary considerations.

In terms of the length, what we would like to do is each side have 60 pages total of briefing to allocate them on opening and answering and 50 pages per side total for findings, again to be allocated as each side wishes for opening and answering.

THE COURT:  So, oh, okay.  So, in other words, the total number of pages of findings of fact overall would be a hundred, a max of a hundred, and the total amount of briefing overall would be a max of 120 pages.

MS. JACOBS:  That's correct, Your Honor.

THE COURT:  So, here's -- and the general concept with one exception seems fine to me, but the one exception is that I am leery of not having at least reply briefs where you have a chance to say, you know, in the 60 pages or so rifaximin argument that might have just been submitted as an answering, that there's a few mistakes there at least.

So, what I'm wondering is -- I guess what I'm wondering is could we maybe move up the schedule for the opening and the answering round by a week to then give a

week to have, you know, up to a ten-page reply brief that would be separate from all these other pages?  Because I just want to make sure, and I don't mean this in any derogatory fashion to anyone, but I want to make sure that I have you all helping to keep each other honest.

Would that interfere with something else, or is that all right?

MR. LANDMON:  That's acceptable to us, Your Honor.

MS. JACOBS:  And for us as well, Your Honor. We'll work with that.

THE COURT:  So, good.  So, it would also be the case that I would get hyperlink briefs and findings of fact, you know, a couple days or what I assume is reasonably possible after all this is submitted?

MS. JACOBS:  Yes, Your Honor.  We've done that before.  We can arrange to have that -- I assume you want us to wait until it's all in?

THE COURT:  Yeah, yeah.  There's no -- I think it's unrealistic to -- I know it's a hundred-percent unrealistic to expect me to do anything until I get the whole package.  Let me see whether anybody else -- yeah. Yeah.  Wait until the end.

MS. JACOBS:  And just to make sure I'm clear what Your Honor is saying, so in terms of incorporating this

ten-page reply, that would be in addition to the pages that we're sending?

THE COURT:  Yes.  And basically, what I would say is don't use any of that ten -- you know, reserve -- I would like each side to reserve up to ten pages for these reply briefs.  I mean, I would like you to reserve ten pages.  You don't have to use them all, but I don't want you to be using them earlier on.  I'd like to make sure that I have that check.

MS. JACOBS:  So, I guess what I'm asking is when we said 60 pages per side briefing --

THE COURT:  That's 60 pages for the opening and the answering.  There's another ten for the reply.

MS. JACOBS:  Thank you, Your Honor.

THE COURT:  Sorry.

MS. JACOBS:  Got it.

THE COURT:  Okay.  So, that's all good.  Is there anything else that we need to discuss now?

MR. REED:  No, Your Honor.

MS. JACOBS:  No.

MR. LANDMON:  No.

THE COURT:  Okay.  All right.

Well, then thank you for the arguments this morning.  They've been helpful, as have, basically, your presentations during the entire trial.  And look forward to

the briefing.  And, again, thank you for your cooperation during the case.

All right.  So, we'll be in recess.

DEPUTY CLERK:  All rise.

(Court was recessed at 10:38 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court